# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

NANCY J. GARSIDE,

Plaintiff,

-vs-                                                    DECISION & ORDER

HILLSIDE FAMILY OF AGENCIES,                            09-CV-6181-CJS

Defendant.

## APPEARANCES

For Plaintiff:              Christina A. Agola, Esq.
                           2100 First Federal Plaza
                           28 East Main Street
                           Rochester, NY 14614
                           (585) 262-3320

For Defendant:             Todd R. Shinaman, Esq.
                           Joseph A. Carello, Esq.
                           1100 Clinton Square
                           Rochester, New York 14604
                           (585) 263-1000

## INTRODUCTION

**Siragusa, J.** This employment discrimination case is before the Court on Defendant's motion (Docket No. 10) for summary judgment. For the reasons stated below, the application is granted.

## FACTUAL BACKGROUND

Plaintiff is a lesbian female who was hired by Hillside Family of Agencies ("Hillside") in November 2006 as a Financial Analyst. She claims that her supervisor, Nina Nechipurenko ("Nechipurenko") discriminated against her on the basis of her sex, her sexual orientation (lesbian) and because she was single with a same-sex partner. In her papers

filed in opposition to the motion for summary judgment, Plaintiff also claims that Defendant retaliated against her for engaging in a protected activity.

### Interview for the Position

Plaintiff interviewed for the position of Financial Advisor with Chief Financial Officer Paul Perrotto ("Perrotto"), Finance Group Director Nechipurenko and Accounting Manager Allison Randall ("Randall"). For the interview, Plaintiff wore a business suit with a "floral print," "understated" makeup, earrings, and a short hairstyle. (Garside Dep. 19:2–20.) Although Plaintiff claims she does not know who hired her, Nechipurenko filed a deposition asserting that she was the one who made the decision to hire Plaintiff. (Nechipurenko Decl. (Dec. 29, 2009) ¶ 2). As a Financial Analyst, Plaintiff's responsibilities included developing budgets for new service programs and requests for proposals for new service opportunities. Nechipurenko directly supervised plaintiff and, at the time of plaintiff's hire, three other Financial Analysts—Steve Feszczyszyn, Luisa Giovanni and Lori Lippa.

### Hillside Personnel Manual

Hillside is an equal opportunity employer that hires and provides terms, conditions and privileges of employment without regard to, *inter alia*, gender, marital status, or sexual orientation. Upon hiring, Plaintiff received and reviewed a copy of the Hillside Personnel Policies Manual. The manual contains an equal employment opportunity statement, and encourages any employees who feel that they have been discriminated against to report such incidents to their supervisors or Human Resources. The manual contains a Harassment/Sexual Harassment policy, which prohibits harassment on the basis of, *inter alia*, gender, marital status, or sexual orientation. The harassment policy instructs any employee who believes she has been harassed to report the incident to either her immediate supervisor, the Human Resources Manager, Assistant Human Resources Manager, or Chief

Standards Officer, and lists the phone number for each of these individuals. In relevant part, the manual states that, "[a]ll employees are accountable for this policy. Violations may lead to disciplinary action which, in sufficiently severe cases, may lead to termination from Hillside after thorough investigation." (Hillside Family of Agencies, Human Resources: 4000, Personnel Policies (Shinaman Aff. Ex. C) 36.) Further, the manual requires supervisors to,

> take immediate and appropriate corrective action upon observing or learning of any incident of any form of harassment by or against a personnel member. This includes but is not limited to harassment by a supervisor against a subordinate, by one personnel member against another, or by a personnel member against a non-personnel member of the Hillside or outside community….

(*Id*.) The manual also contains a Conflict Resolution Policy, which instructs employees on steps to follow when they perceive a conflict with a co-worker or supervisor. The Conflict Resolution Policy encourages employees to present unresolved conflicts to the Human Resources staff. On January 22, 2007, Human Resources Partner Amy Fagan wrote plaintiff a letter to introduce herself as plaintiff's primary Human Resources contact. Plaintiff did not report any incidents of harassment to Ms. Fagan during her employment.

***Plaintiff's Dress***

Plaintiff regularly wore women's business suits to work, which either had flowered prints or were dark solid colors. Plaintiff did not wear makeup, and wore flat shoes, and earrings. Plaintiff wore her hair between two and four inches long. Other females in the department, including Nechipurenko, wore either business suits or skirts, makeup, shoes with a slight heel or heels, and earrings, necklaces and bracelets. Plaintiff testified in her deposition that Nechipurenko wore "more colorful things, a little more, maybe, flamboyant hairstyle, makeup, maybe possibly jewelry." (Garside Dep. 36:6–8.)

### *Derogatory Remarks and Treatment*

Although Defendant claims that, "No one at Hillside, including Ms. Nechipurenko, ever made derogatory remarks regarding plaintiff's dress, mannerisms, or sexual orientation. Ms. Nechipurenko never made any negative comments about plaintiff's partner or children," Plaintiff testified at her deposition about one interaction she had with her supervisor, Nechipurenko, that Plaintiff interpreted as an implied negative comment (Garside Dep. 72:215–21):

> So I was not a known entity, and I was doing my best to incorporate myself into the team, team player. And it wasn't easy at first because I think that my—the way I create budgets was different than the person before me.
>
> So at one point I did say to Nina [Nechipurenko], you know, it's a little bit—it's, you know, takes time to get assimilated and to a new work environment. And she said to me that she believed the reason that the two women who wrote the service grants weren't accepting me was because I'm not a pretty girl. And I didn't respond.
>
> But in my gut, my stomach sank. I felt that—I felt that it was sexist and I felt that I believed it was because I was a lesbian. She was referring to—making innuendo, but I felt insulted and disturbed.

(Garside Dep. 73:10–74:2.) Plaintiff went on to explain that the term, "not a pretty girl," in the lesbian community, means a lesbian who is "not particularly feminine, and more to the butch appearance." (Garside Dep. 76:2–3.) Plaintiff also testified at her deposition that Nechipurenko treated her differently from everyone else. She said:

> Well, I would see her In the hallway in the morning and say good morning. And she would completely ignore me and not respond. And she would give me my assignments, eventually, by just putting them on my chair. So when I would walk in in the morning, there would be a pile of assignments that I was to decipher on my own. And she would go out to lunch often with many people in the department and exclude me, never invite me. Openly exclude me.

(Garside Dep. 72:8–17.)

In response to being asked at her deposition whether anyone other than Nechipurenko treated her poorly based on her sexual orientation, Plaintiff responded:

> I did have an experience in the Human Resource Department where it was time to sign up for benefits, health care, dental care, eye care and it was my first time. And I went to hand in my forms, my documents, and I went up—you know, it was—there was a date that you have to complete it by. So I went up to Human Resources and wanted to hand in my paperwork. And I handed it into the receptionist and then she said, "Wait here." And she brought it back to a woman named Madonna and I was sitting down. It was, like, kind of like an open foyer where it's kind of, like, the reception area where people who may be wanting to apply for jobs can come in and apply for jobs. It was not just necessarily Hillside employees even, I don't think.
>
> And so I'm sitting there and there were a bunch of other people in the room. And Madonna came out to the reception area and said to me, "Who is this?" And I said, "Well, what do you mean?" She said, "Who is this you have on"—she kind of shook the paper at me—she said, "Who is this you have on this form here?" And I said, "It's my partner and my children." And she said, "You cannot have her on this plan…."
>
> So Madonna told me I could not have this woman—at the time was my partner[1] on the plan. And I said, "I think I can." And so then Madonna went back and I was kind of embarrassed because there were a bunch of people around the room. I felt humiliated, especially since I thought the HR person who handles it should know whether or not Hillside has domestic partner benefits. So then she went back to her office and she sent somebody else to talk to me. And the woman told me that they would not process my forms unless I went downtown to the city of Rochester and registered as a domestic partner with my partner and paid $40 to get a document and come back and give it to them.

(Garside Dep. 104:23–105:25; 106:6–19.)

Defendant's policy, as explained by Amy Fagan, Hillside's Director of Employee Relations, is that to enroll either a spouse or domestic partner in employer-provided benefits, all employees must fill out a "Marriage/Domestic Partnership Certification." (Fagan Decl. ¶ 4). The certification requires the employee to list her spouse or domestic partner's name, to

---

[1]Plaintiff later described her partner, Mary Jane Hannan, as her ex-partner. (Garside Dep. 107:24–108:2.)

certify that they are legally married and/or domestic partners, and to list the city and state in which their marriage license or domestic partnership agreement was filed. (Fagan Decl. ¶ 5 & Ex. A). As Fagan explained,

> [s]ince plaintiff and her partner had not entered into a domestic partnership agreement at the time that she initially applied for these benefits, a Hillside benefits representative instructed her that, in order to truthfully fill out the certification, she and her partner would have to enter into and file a domestic partnership agreement. Any employee claiming to be married, but who could not certify to having filed a marriage license would have had to obtain and file one.

(Fagan Decl. ¶ 6.) Although discovery is now complete,[2] Plaintiff responds to this information by stating that she is unaware of whether Hillside required a married person to produce a copy of his marriage certificate. (Pl.'s Response to Def.'s Local R. 56.1 Statement ¶ 11.) Fagan's representation, therefore, is uncontested for the purposes of this motion.

***Work Instances***

In February or March 2007, Plaintiff expressed difficulty juggling all of her assignments, and Nechipurenko advised her not to spend time on the Internet researching her assignments, as other Hillside employees were responsible for performing such research. Plaintiff, however, describes the advice as follows:

> Nina also told me that I was not to use the [I]nternet to research my projects, which I found that to—I found researching my Requests For Proposal Projects on the [I]nternet helpful when I would create a meaningful budget. I need to understand the project that we were bidding for, have conceptual knowledge and awareness. So Nina had forbade me to use the [I]nternet during my work hours; she forbade me to talk to the accounting manager; and this one project was totally an accounting problem. Huge problem.

(Garside Dep. 58:12–22.)

---

[2]Per the case management order entered by U.S. Magistrate Judge Jonathan W. Feldman on June 17, 2009 (Docket No. 8), all discovery was to be completed by November 13, 2009.

In response to a complaint from Randall, Nechipurenko further advised Plaintiff to email her any questions, and not to take up Randall's time with her inquiries. Plaintiff described this situation in her deposition as follows: "Nina had told me that she would no longer speak to me and that she would only manage me via email. I was not to talk to her." (Garside Dep. 56:3–6.) However, Defendant responds that during the Spring of 2007, Nechipurenko experienced an extremely busy work schedule due to the recent departure of a co-worker and her work on Hillside's annual budget, which was due May 5, 2007. (Nechipurenko Decl. ¶ 4). She therefore instructed all of her subordinates to send any questions they had via email, which permitted her to address questions as time permitted, often on nights and weekends. (*Id*.) Plaintiff, though, testified that Nechipurenko spoke with the other financial analysts. According to Plaintiff, one, Luisa, indicated that Nechipurenko did not tell her to communicate by email and, another, Lori Lippa, said that she talked to Nechipurenko many times per day. Nechipurenko had, by then, fired the other financial analyst, Steve. (Garside Dep. 64:19–25.)

In April 2007, Perrotto invited Plaintiff to observe the annual budget workshop. (Nechipurenko Decl. ¶ 5.) Perrotto informed Nechipurenko that he had invited Plaintiff, and Nechipurenko, believing it would be a good learning experience, invited her other subordinates to attend the meeting as well. (*Id*.) Prior to the start of the meeting, Plaintiff sat at the table where the meeting was to be held. (*Id*. at ¶ 6). Perrotto asked plaintiff to take a seat away from the table. (*Id*.) Plaintiff, along with all those invited to observe the meeting, sat away from the table. (*Id*.) Plaintiff described it as follows:

> And one day [Perrotto] called me into his office and he said, "I would like you to attend the finance board meeting—Finance Committee meeting of the board of Hillside family of Agencies."

And I said to him, "Paul, did you talk to Nina about this yet?"

He said, "No."

I said, "Well, I think you better because I do not think she would like that at all."

And he said, "Oh, okay. I will talk to her." He goes—no. He said, "You tell her."

So I said, "Okay."

So I went into Nina's office and I said, "Nina, Paul Perrotto just invited me to the Finance Committee board meeting."

And Nina snapped at me and said, "That's my meeting."

And I said, "I know it's your meeting, but Paul just invited me to attend It." So I left her office and shortly thereafter a mail note came out from Nina inviting her direct reports to attend the Finance Committee meeting.

And so when I went to the Finance Committee meeting, which was on Monroe Avenue, and we were located at Mustard Street—I'd never been to one of these meetings before and so I just—I was there kind of early. And I sat down in a chair and I saw Nina glaring at me and go over and whisper to Paul. And Nina stormed out of the room and Paul came over and explained to me that I was not to sit in that chair, that I had to sit against the wall.

(Garside Dep. 135:8–136:14.)

On April 10, 2007, Nechipurenko issued a positive performance evaluation to Plaintiff.

Subsequently, in late April 2007, Plaintiff emailed a paid time off request to Nechipurenko.

(Nechipurenko Decl. ¶ 8), who did not immediately approve the request, because it was her

practice to have her employees merely inform her that they would be taking time off. (*Id*.)

Plaintiff described the situation as follows:

[I]t was my twins First Communion—First Communion I think it was. My mother was flying up from New Jersey for a week. And I think I left Nina a voicemail and she didn't respond. It was getting close to the time I needed to know. I went to HR, "How long does a manager have to respond to a PTO request," and Chris said 24 hours.

I said, "Well, Nina's not responding."

So I went back downstairs and, again, I asked Nina for the two-day PTO that I had earned and she snapped and me and said, "You don't have any PTO."

> I kind of anticipated that and I had my timecard pay stub In my hand that showed I had two days PTO earned. I said, "Actually, I do have paid time off. And she walked away—I think she said, fine. Then she walked away disgusted.… I did [get the time off], but I also believe that I was retaliated against.…[T]hat's when she started leaving assignments on my chair instead of actually speaking to me about them.

(Garside Dep. 87:2–88:10.) Plaintiff complained to Chris Kunz, ("Kuntz") Human Resources Partner, because Nechipurenko did not immediately respond to the request. Plaintiff, however, did not complain that she felt Nechipurenko was harassing her on the basis of any protected category. Kunz suggested that plaintiff ask Nechipurenko again about the time off request. Nechipurenko ultimately acknowledged the request, and Plaintiff took the time off.

In March 2007, Defendant state that Plaintiff received an assignment regarding a proposal related to a grant. As a part of the assignment, Plaintiff traveled to New York City. Both Plaintiff and Nechipurenko did not know at the time that the grant was an ongoing grant that would typically have been assigned to accountant Michelle Stoycon, rather than one related to new services, which was Plaintiff's area of specialization. On April 19, 2007, Plaintiff sent an email to Pam Ayers, who was working on the project with her, informing her that she did not "have the capacity to complete" both this project and another project by their respective deadlines. Ayers suggested that Stoycon take over the project involving the ongoing grant, since she was more familiar with the process for ongoing grants. The project was therefore re-assigned to Stoycon. In contrast to Defendant's description, Plaintiff related this situation in her deposition testimony as follows:

> Q. Ms. Garside, was there a situation involving a trip that you took to New York City that you felt was not handled well by Nina?
>
> A. Yes.
>
> Q. Can you describe that?
>
> A. Well I mentioned that I created the budgets for new services, Requests For Proposals and when the assignments were handed out, typically Pam

Ayers or Jennifer Kathy would send—they're the people that wrote the Request For Proposal. They would write the application to receive the grant—to be awarded the grant.

And they would send a note to Nina and often copy me in if it was a new one or even—they copied me in a lot. And the question would be "Who will you assign to this RFP?" And often it would get sent back: "Nancy, Nancy will work on this one." And this particular time Tess—I don't know Weatherspoon—I forget her last name—Tess Weatherspoon or something. She's a vice president and responsible for about, I don't know, four or five programs. And I liked her very, very much. I was really impressed with her work ethics and how she ran her programs and how she treated her people. And she called me up one day and said, "Nancy, we have had problems with this grant before, big trouble." And the federal employees that audit and monitor the grant were really, really mad at them because the whole —apparently the history of the grant, it was a five year, five year grant—the federal people paid a lot of attention to it because apparently there was a lot of misunderstanding from Hillside's end on what they were supposed to report and why and how.

Q. So this was not a new grant, this was something that had been ongoing?

A. Yes. And Tess called me and said "Nancy, I want you to come to New York City with me, because this thing got so screwed up five years ago—because I want you there because I have a feeling that you will be able to make sure this goes through smoothly." And she says, "What's your childcare situation? Would you be able to take a trip to New York City?"

I said, "I could take a trip to New York City. My kids are okay. My partner would be with them." She said, "Okay. Here is what I am going to do. I'm going to call Nina and ask her if you can come with us.

I said, "Okay."

And she called Nina, apparently, and Tess called me back and said Nina said, "You can come with me." So Nina knew I was going. And I went with Tess and Bill Camp and Pam Ayers. The four of us went. So we went to the Federal Building, met with the woman who monitors this. Well, she probably monitors like eight states—not eight states. She had to go to Puerto Rico or for some reason. That confused me. She's a federal employee. Maybe she does have eight states. She says this particular—she has like 200 grants on her desk at any point in time.

She said this one stuck out because it gave her so much grief, this is what the federal employee said. We were there the whole day understanding what they wanted and exactly how they wanted it. I met with the women admini-strator and finance person who looked at it from a financial perspective. And I think I gained a really good understanding what they wanted.

And the finance woman said, the budget didn't even add last time, the numbers didn't add. They didn't use an Excel spreadsheet. They did it on a [W]ord document or something. So anyway, it was a long day 16, 17 hours, a long day.

The next day, or I don't know, couple days—maybe couple days later Bill Camp, I ran into Bill Camp, he's like, "Whoa, I heard you got your head handed to you over that New York City trip."

I'm like, what are you talking about?

He said, "I heard Nina's furious that you went to New York."

I'm like, "How could that be? She assigned me to go."

And then Nina called me into her office at some point and said, I should never, ever have gone to New York City. That it's Michelle Stoycon's program. And I didn't say anything. I just thought, well, she, via email, she assigned me to the case via email. Then again told me to take the trip.

So then I worked really, really hard on that. Really. I don't know if it was like five weeks—a lot of effort and energy. It was kind of complicated.

And then I'd say when I was about roughly, estimating probably about 95 percent done with it and it was due in maybe three days, two days or three days, she removed me from the project and had Michelle take over, Michelle Stoycon.

So I said to Michelle, "Michelle, I'll help you in any way. You know, don't hesitate. I'll help you in any way I need. Don't worry. I'll explain everything to you."

And Michelle said to me, "I have no idea why she is doing this to either one of us." She said, "I don't want this. You should keep it. I don't understand why she is doing this to either one of us."

I said, "I don't either."

So it got done. And shortly thereafter we had a staff meeting for the finance, and Nina went on and on and on giving Michelle glorious praises for all the wonderful work Michelle did on the project and how Michelle was an exemplary employee and she just did a fantastic job on this grant renewal. I just sat there and thought, just couldn't understand for the life of me what made her tick.

(Garside Dep. 124:6–128:25.) Notwithstanding this narrative, Plaintiff admitted during her deposition that she sent an email to Nechipurenko stating, "I do not think I have the capacity to complete both RFPs simultaneously by Wednesday 4/25/07." (Garside Dep. 131:11–15.)

She was referring to the proposal for the project that involved her trip to New York City, as well another one. (Garside Dep. 131:24–132:3.) From her interactions with Nechipurenko, Plaintiff concluded that Nechipurenko, "did not like me because I'm gay, and she was—I believe she was trying to drive me out of my job." (Garside Dep. 134:12–14.)

On April 26, 2007, Nechipurenko assigned Plaintiff a project via email, and asked her to research the issue and "touch base" with Perrotto. On May 15, 2007, Nechipurenko sent Plaintiff an email to inquire about the status of the assignment. Plaintiff responded to this email, and she asked Nechipurenko to confirm whether she was to meet with Perrotto. Nechipurenko replied that she suggested this approach in her initial email of April 26. Plaintiff then went to Nechipurenko's office to discuss the assignment and the email Nechipurenko had sent. Plaintiff contends that  Nechipurenko immediately became angry and started yelling once Plaintiff entered her office. Although Plaintiff cannot recall exactly what Nechipurenko said, she did not tell plaintiff that she was fired, or any words to that effect.

According to Nechipurenko's account of the event, Plaintiff said that she was resigning from Hillside effective immediately. Based on this communicaiton, Nechipurenko then went to Human Resources for guidance, and was instructed to get Plaintiff's resignation in writing. Subsequently, Nechipurenko drafted Plaintiff a letter of resignation. Plaintiff recites the following narrative regarding the letter:

> There came a time when Nina Nechipurenko wrote a Resignation Letter In my name, and I believe that was done in the Human Resource Depart- ment—in conjunction with the Human Resource Department.

> Nina—I was in Nina's office and she yelled and screamed at me, and I left her office. And she went upstairs to Human Resources, and I suspect in conjunction with the Human Resource representative, wrote a letter for my resignation with my name on it and told me I had to sign it immediately.

> And I thought that was ethically wrong and unprofessional and hostile and threatening that she would have the audacity to write a letter with my name on it when I never, ever, knew anything about it.

(Garside Dep. 40:12–25.) Nechipurenko gave Plaintiff the letter and told her to sign it. (*Id.* 43:2–3). However, Plaintiff did not sign the resignation letter Nechipurenko presented to her, and told Nechipurenko that she could write her own resignation letter. According to Plaintiff, she felt that she could no longer bear Nechipurenko's treatment. Later in the morning of May 15, 2007, Plaintiff emailed Perrotto, Hillside Human Resources Director Frank Kaiser ("Kaiser", and Human Resources Partner Amy Fagan, and stated she was resigning her employment with Hillside after a conversation with Nechipurenko. Approximately two weeks later, Plaintiff spoke with Kaiser for a two-hour long exit interview. She told him she loved her job and wished all the negativity had not happened. (Garside Dep. 98:2–3.) She did not, though, tell him she wanted her job back. (*Id*. 98:4–5.)

## STANDARDS OF LAW

### *Summary Judgment*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001);

*Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non–moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S. Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986).

Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Of course, it is well–settled that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, the general rule holds and a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### Title VII

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' 42 U.S.C. § 2000e-2(a)(1)." *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436 (2d Cir. 1999). "Title VII does not establish a 'general civility code' for the American workplace. Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atlantic*, 385

F.3d 210, 223 (2d Cir. 2004) (citation omitted). The "law is well-settled in this circuit and in all others to have reached the question that…Title VII does not prohibit harassment or discrimination because of sexual orientation." *Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir. 2000); *but see Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. 2005) ("sex stereotyping [by an employer] based on a person's gender non-conforming behavior is impermissible discrimination." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 575 (6th Cir. 2004). That is, individual employees who face adverse employment actions as a result of their employer's animus toward their exhibition of behavior considered to be stereotypically inappropriate for their gender may have a claim under Title VII."). However, as the Court in *Dawson* cautioned, "[l]ike other courts, we have therefore recognized that a gender stereotyping claim should not be used to 'bootstrap protection for sexual orientation into Title VII.'" *Dawson*, 398 F.3d at 218 (quoting *Simonton v. Runyon*, 232 F.3d 33, 38 (2d Cir. N.Y. 2000).

### New York Human Rights Law

"[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629, n.1 (2d Cir. 1997), *cert den*. 522 U.S. 997, 118 S. Ct. 563, 139 L. Ed. 2d 404 (1997). When addressing the validity of a sexual orientation claim under New York law, the Second Circuit observed:

> While claims of sexual orientation discrimination are actionable under the NYSHRL and NYCHRL, we have already noted that the question of whether such claims can survive summary judgment is determined by the same analysis as for Title VII claims.

*Dawson v. Bumble & Bumble*, 398 F.3d 211, 224 (2d Cir. 2005). "The New York Human Rights Law made sexual orientation…a protected trait as of January 16, 2003. *See* N.Y. Exec. Law § 296(1)(a) (McKinney 2005)." *Wilder v. Newman*, 167 Fed. Appx. 828, 829 (2d

Cir. 2006); *accord DiPetto v. United States Postal Serv.*, No. 09-3203-cv, 2010 U.S. App. LEXIS 14184, *5 n.1, 2010 WL 2724463 (2d Cir. July 12, 2010) ("sexual orientation is not a protected category under Title VII. *See Dawson v. Bumble & Bumble*, 398 F.3d 211, 217 (2d Cir. 2005). There might, however, be a pendent state law claim. *See* New York State Human Rights Law, N.Y. Exec. Law § 296.")

***Hostile Environment***

To establish a claim of hostile work environment discrimination, a plaintiff must show that the harassment was sufficiently severe or pervasive to alter the conditions of the her employment and create an abusive working environment. In other words, a plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. Proving such a claim involves showing both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.

The principles for determining whether conduct was sufficiently severe and pervasive to support a hostile environment claim are clear: Although isolated incidents ordinarily will not rise to the level of a hostile work environment, even a single incident of sufficient severity may so alter the terms and conditions of employment as to create such an environment. The matter of whether the conduct alleged was so severe or pervasive as to create an objectively hostile or abusive work environment, is to be decided based on the totality of the circumstances, in light of such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Where

reasonable jurors could disagree as to whether alleged incidents of…harassment would

have adversely altered the working conditions of a reasonable employee, the issue of

whether a hostile work environment existed may not properly be decided as a matter of law.

*Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004) (citations and internal

quotations omitted). As the Supreme Court observed in *Oncale v. Sundowner Offshore*

*Servs.*, 523 U.S. 75, 81 (1998):

> the objective severity of harassment should be judged from the perspective
> of a reasonable person in the plaintiff's position, considering "all the
> circumstances." *Harris*, *supra*, at 23.[3] In same-sex (as in all) harassment
> cases, that inquiry requires careful consideration of the social context in
> which particular behavior occurs and is experienced by its target. A
> professional football player's working environment is not severely or
> pervasively abusive, for example, if the coach smacks him on the buttocks
> as he heads onto the field-even if the same behavior would reasonably be
> experienced as abusive by the coach's secretary (male or female) back at
> the office. The [*82] real social impact of workplace behavior often depends
> on a constellation of surrounding circumstances, expectations, and
> relationships which are not fully captured by a simple recitation of the words
> used or the physical acts performed. Common sense, and an appropriate
> sensitivity to social context, will enable courts and juries to distinguish
> between simple teasing or roughhousing among members of the same sex,
> and conduct which a reasonable person in the plaintiff's position would find
> severely hostile or abusive.

In *Oncale*, the Supreme Court rejected the arguments made by respondents and the *amici*

that, "recognizing liability for same-sex harassment will transform Title VII into a general

civility code for the American workplace." *Oncale*, 523 U.S. at 80. Justice Scalia, instead,

observed that, "The critical issue, Title VII's text indicates, is whether members of one sex

are exposed to disadvantageous terms or conditions of employment to which members of

the other sex are not exposed." *Oncale*, 523 U.S. at 80 (citing Harris v. Forklift Systems, Inc.,

---

[3]*Harris  v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). The Second Circuit addressed the implications of the Supreme Court's ruling in three cases, *Burlington Industries*, *Faragher* and *Ellerth* cases, writing:

> When an actionable hostile work environment is created by an employee's supervisor, the employer is subject to vicarious liability and the employee need not establish knowledge of the harassment. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *accord Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). When the harassment does not result in a tangible employment action, the employer may still present an affirmative defense to responsibility that "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; *see also Ferraro*, 440 F.3d at 101-03 (applying the *Faragher/Ellerth* affirmative defense).

*Williams v. Consol. Edison Corp.*, 255 Fed. Appx. 546, 550 (2d Cir. 2007).

**Constructive Discharge**

The Supreme Court outlined the burden on a plaintiff who claims she was forced to resign as a result of a hostile work environment:

> A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. *See, e.g., Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir. 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment,…the facts alleged [for constructive discharge must be]…so intolerable that a reasonable person would be forced to quit."); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

*Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004) (footnote omitted).

**Retaliation Under Title VII**

Title VII also contains an anti-retaliation provision, which the Supreme Court addressed in *Burlington Northern & Sante Fe Ry Co. v. White*, 548 U.S. 53 (2006). The provision states in pertinent part as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees…because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). In interpreting that language, the Second Circuit, reviewing the Supreme Court's decision in *White*, wrote:

> In *White*, the Supreme Court announced a different standard. The *White* Court ruled that "the anti-retaliation provision [of Title VII], unlike [Title VII's] substantive provision, is *not* limited to discriminatory actions that affect the terms and conditions of employment." 126 S. Ct. at 2412-13 (emphasis added). Rather, to prevail on a claim for retaliation under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 2415 (internal quotation marks omitted).

*Kessler v. Westchester County Dep't of Soc. Servs*., 461 F.3d 199, 208 (2d Cir. 2006). The elements for a retaliation claim are:

> (1) the plaintiff engaged in protected participation or opposition under Title VII; (2) the employer was aware of this activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the employer's action.

*Kessler v. Westchester County Dep't of Soc. Servs*., 461 F. 3d 199, 205–06 (2d. Cir. 2006).

The law is well settled that, "the key inquiry is whether the effect of defendants' decision was 'materially adverse,' *i.e.*, ''harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.''" (*Ragusa v. Malverne Union*

*Free Sch. Dist.*, 2010 U.S. App. LEXIS 12640 (2d Cir. 2010) (quoting *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 69 (2006)) (analyzing retaliation claim under Title VII, 42 U.S.C. § 2000e et seq.)) (other citations omitted).

### McDonnell Douglas Standard

Under the standard established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff bears the burden of proof and must ultimately establish, by a preponderance of the evidence, (1) membership in a protected group; (2) qualification for a position; (3) an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). To establish that the adverse employment action occurred under circumstances giving rise to an inference of discrimination, a plaintiff may demonstrate that "similarly situated" employees who do not share the plaintiff's protected characteristics were treated preferentially. *Id*.

Requirements for establishing a *prima facie* case are minimal. *See Austin v. Ford Models, Inc.*, 149 F.3d 148, 152 (2d Cir. 1998). If a plaintiff is successful in demonstrating her *prima facie* case, then the burden shifts to his employer to articulate a legitimate, non-discriminatory purpose for its adverse employment action. *Id*. at 153 (citing *McDonnell Douglas, Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). The Second Circuit has held that "[a]ny such stated purpose is sufficient to satisfy the defendant's burden of production; the employer does not have to persuade the court that the stated purpose was the actual reason for its decision." *Austin v. Ford Models, Inc.*, 149 F.3d at 153.

Once the employer satisfies its burden, a plaintiff may prevail only if he presents evidence that the employer's proffered reasons are a pretext for discrimination. *Id*. A plaintiff, to demonstrate pretext, must show both that the proffered reason was false and that discrimination was the real reason. *Id*. In applying the *McDonnel Douglas* criteria to a case under the Age Discrimination in Employment Act, the Supreme Court has held that a plaintiff's *prima facie* case, combined with sufficient evidence for a reasonable fact finder to reject the employer's nondiscriminatory explanation for its decision, may be adequate to sustain a finding of liability for intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). Justice O'Connor, writing for a unanimous Court, said, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id.*; *see also Regional Economic Community Action Program, Inc. v. United States*, 294 F.3d 35, 49 (2d Cir. 2002).

## ANALYSIS

### Hostile Work Environment

Defendant contends that Plaintiff cannot make out a *prima facie* case of hostile work environment due to sex discrimination. The Court agrees. Only one remark in all the information included in support of, and opposition to, the subject motion is even remotely relevant to sexual harassment. When Nechipurenko and Plaintiff were discussing why "the two women who wrote the service grants weren't accepting me," Nechipurenko offered that it "was because [Plaintiff is] not a pretty girl." (Garside Dep. 73:18–20.) No proof was submitted that the "pretty girl" comment was made in close proximity to Plaintiff's departure from Hillside. Further, the comment, assuming it was made as described by Plaintiff, was

in reference to why two *other* women, not Nechipurenko, might not be accepting of Plaintiff. The two women are only described as "the two women that wrote the grants" at Crestwood Children's Center, which is not tied by the evidentiary proof to Hillside. (Garside Dep. 73:7–9.)

The remainder of the allegedly hostile acts described by Plaintiff are not tied to sexual harassment. Evidence that Nechipurenko publically reprimanded Plaintiff, implied she was incompetent and questioned her, do not show a hostile work environment with respect to Title VII or the New York Human Rights Law. *See Bell v. Raytheon Co.*, No. 3:08-CV-0702-G, 2009 U.S. Dist. LEXIS 67016 (N.D. Texas Jul. 31, 2009) ("plaintiffs' general assertion that Malanowski belittled them constantly and routinely questioned their truthfulness is too vague to support a finding of hostile work environment."). The harassment described by Plaintiff was not objectively sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment.

Further, Plaintiff has not made any connection between the hostility she attributes to Nechipurenko and her gender or sexual orientation. If Plaintiff is attempting to show that Defendant discriminated against her on the basis of gender stereotyping, that would not be actionable under Title VII. *Dawson v. Bumble & Bumble*, 398 F.3d 211, 218 (2d Cir. N.Y. 2005) ("Like other courts, we have therefore recognized that a gender stereotyping claim should not be used to 'bootstrap protection for sexual orientation into Title VII.'") (citation omitted).

Moreover, nothing in the papers before the Court shows that Plaintiff was subjected to an adverse employment action. "Typically, adverse employment actions are economic injuries such as a termination, suspension, failure to promote, or diminution in pay. See

*Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)." *Lennon v. New York City*, 392 F. Supp. 2d 630, 642 (S.D.N.Y. 2005). In *Sanders*, the Second Circuit defined an adverse employment action as:

> a "materially adverse change in the terms and conditions of employment. *See Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999). To be materially adverse, a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry* [*v. Ashcroft*], 336 F.3d [128] at 138 [(2d Cir. 2003)]. Examples of such a change include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.*

*Sanders*, 361 F.3d at 755. The evidentiary proof does not suggest that Plaintiff was demoted, experienced a diminishment in pay, was given a less distinguished title, or experienced a material loss of benefits or responsibilities. Further, the evidentiary proof does not establish that Plaintiff faced a severe and pervasive environment of hostility due to her sex (for purposes of Title VII and the New York Human Rights Law), or her sexual orientation (for purposes of the New York Human Rights Law), and her decision to resign was not prompted by a perception that "a reasonable person would have felt compelled to resign." *Suders*, 542 U.S. at 147.

### *Retaliation*

Turning to Plaintiff's recent claim of retaliation, she has not identified the protected activity in which she was allegedly engaged for which Defendant retaliated against her. Plaintiff alleges in her complaint that she engaged in the following protected activities:

> Plaintiff informed HR that Nechipurenko was denying her the right to take PTO; specifically, she had indicated to her supervisor that her twins were to have their first communion. Plaintiff informed HR that it had taken Nechipurenko over 4 days to approve her PTO when traditionally it only took 24 hours. Plaintiff further indicated that Nechipurenko had alienated her in the workplace, and that she treated her in a disparate fashion, and that she

has created a hostile environment based on same sex harassment, indicating that Nechipurenko told her that the reason why she was not "accepted" was because she was not a "pretty girl." Plaintiff told HR that she was fearful of Nechipurenko, given her hostile proclivities to scream and berate similarly situated female employees in the workplace.

(Compl. ¶ 21.) Plaintiff did not complain to anyone about the "pretty girl" comment. (Garside

Dep. 84:14–17.) At the New York State unemployment hearing, Plaintiff testified with regard

to her departure from Hillside:

Q. So the answer was, no, you did not go up to human resources, then?

A. I did not go up to human resources then. I did write Frank a note, though.

Q. And that is a note that you wrote on the Internet or on an email or what?

A. Yes.

Q. And when did you write that?

A. Let's see. Oh I wrote it to Amy and copied Frank in. I wrote it on 5/15 at 11:08 a.m.

Q. Okay. Was that the note where you're saying that you're resigning?

A. Yes.

Q. So no note, though—

A. I wrote that after she handed me my letter.

Q. Okay. But no complaint or anything else to human resources, relative to feeling as though this was a hostile work environment?

A. I did tell Chris Coombs that.

Q. Okay. When was that?

A. When I met with Chris Coombs when Nina wouldn't—she wouldn't respond to my request for PTO—personal time off.

Q. Okay. And so when was that in relation to your—this conversation that you had with Nina?

A. I believe it was like—I spoke to Chris, I think, in mid April.

Q. Okay, mid April. And did you go ahead, then, at that time and file a formal discrimination claim with HR?

A. No.

(Transcript, *In re Liability for Unemployment Insurance Contributions Under Article 18 of the Labor Law of Nancy J. Garside, Claimant - Respondent, Hillside Family of, Employer - Appellant*, No. 308-04051, Appeal Board No. 543532 (Aug. 21, 2008), at 30:2–31:11 (attached as Exhibit K to Shinnaman Aff.).) Plaintiff, at her pretrial deposition, testified about retaliation as follows;

> Q. You said you thought you were retaliated against. In what way?
>
> A. Well, that's when she started leaving assignments on my chair instead of actually speaking to me about them.
>
> Q. And you felt that was in retaliation for what?…
>
> A. For disagreeing with her about whether or not I had paid time off and persevering in my request.
>
> Q. When you went to Chris Kunz, did you tell Ms. Kunz that you felt you were being harassed?
>
> A. Yeah. I told her, I said, "I'm afraid of Nina." She's, like, "I know." She basically said something like there's a long history there.
>
> Q. Did you use the term, harass or harassment?
>
> A. I believe I did. She told me she was aware of things that go on in that office.

(Garside Dep. 88:6–25.) No evidentiary proof shows that Nechipurenko was ever made aware of the complaints, or that Plaintiff indicated to anyone at Hillside she was complaining about sex discrimination. There being no evidence that Plaintiff was engaged in protected activity, no rational jury could determine Nechipurenko discharged Plaintiff in retaliation.

**CONCLUSION**

For the reasons stated above, Defendant's application (Docket No. 10) is granted.

The Clerk is directed to enter judgment for Defendant and close this case.

IT IS SO ORDERED.

Dated:  January 4, 2011
        Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J.  SIRAGUSA
United States District Judge